Opinion filed July 2, 2026



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00015-CR
_____

**JAMAL DEON BAKER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 35th District Court**

**Brown County, Texas**

**Trial Court Cause No. CR30214**

## M E M O R A N D U M   O P I N I O N

Appellant, Jamal Deon Baker, was charged in a two-count indictment with aggravated assault with a deadly weapon causing serious bodily injury against a family member, Barbara Zapata, a first-degree felony (Count One), and aggravated assault with a deadly weapon against Antonio Zapata, a second-degree felony (Count Two). *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b)(1)(A) West 2026). The jury convicted Appellant of the charged offenses and assessed his punishment at

imprisonment for (1) forty years in the Institutional Division of the Texas Department of Criminal Justice (TDCJ) for Count One, and (2) ten years in the TDCJ for Count Two. The trial court sentenced Appellant accordingly and ordered that Appellant's sentences be served concurrently.

In his sole issue on appeal, Appellant argues that the evidence is insufficient to support the jury's implied rejection of his claim of self-defense. We affirm.

## I. *Factual Background*

The events that led to the charged offenses began with an argument between Appellant and his mother-in-law, Barbara, over a drink. On May 8, 2024, Appellant and his wife, Alyssa Blackburn, traveled to Lake Brownwood for a family gathering at a covered pavilion near the lakefront. Most of the adults that were there, including Appellant, consumed alcoholic beverages that day. At some point, Barbara emptied a plastic cup that Appellant was drinking from and filled it with water.

After he returned, Appellant became upset with Barbara, which drew the attention of Antonio—Barbara's husband—and other family members. Appellant then picked up a knife from a table, made threats to "cut" or "stab" someone, and ultimately stabbed Barbara on her left hip with the knife. The blade became embedded in Barbara's hip and "broke off," leaving a one-inch fragment of the blade protruding from the knife's handle. Antonio fought with Appellant after the stabbing, who continued to swing the knife handle at Antonio during their skirmish; other family members also fought with Appellant before he fled.

### A. *Testimony of Trooper John Hoy*

After he was dispatched to a stabbing at the lake, Trooper John Hoy with the Texas Department of Public Safety encountered Appellant; Trooper Hoy recalled that Appellant, who identified himself as Jamal and matched the description from dispatch, flagged him down from the side of the road about one quarter of a mile

2

from the pavilion area.[1]  Trooper Hoy noted that Appellant was not wearing a shirt or shoes when he made contact with him.  He also observed that Appellant (1) was holding a cell phone, (2) smelled of alcohol, and (3) looked as if he had recently been involved in a physical altercation because he had "some redness" on his person and his general "disheveled appearance."  Appellant told Trooper Hoy that he was "scared" and that people had been "stomping on him."  Despite Appellant's statements, and based on his observations, Trooper Hoy did not believe Appellant needed immediate medical attention, so he detained Appellant and placed him in the passenger seat of the patrol unit and proceeded to the lake.  Upon arriving there, Appellant remained in the patrol unit while Trooper Hoy located Barbara and cleared the area for emergency services.

While Trooper Hoy was at the scene, he heard yelling directed at Appellant, and he noticed that the passenger window of the patrol unit was rolled down.  Video footage from an interior camera in the patrol unit showed that Appellant rolled the window down and that he made a "flipping off" gesture toward individuals who were near the vehicle.  Additionally, Appellant made a phone call to his grandmother while he was in the patrol unit.  Trooper Hoy noted that Appellant was able to mentally engage in multiple conversations while he was detained, alternating between answering Trooper Hoy's questions and responding to his grandmother on the phone.  He also testified to some of Appellant's statements concerning the circumstances of the altercation and noted that Appellant did not indicate that Steven Benson—Barbara's brother—was present when the stabbing occurred.[2]

---

[1]Trooper Hoy testified that his interaction with Appellant was captured by his body camera, as well as the exterior and interior cameras mounted on the patrol unit.

[2]Appellant's statements were captured by an interior camera from Trooper Hoy's patrol unit.

Trooper Hoy transported Appellant to the Brown County jail. He testified that he had "some concerns" as to whether Appellant sustained a head injury during the altercation, and he told other law enforcement officers that he believed Appellant "might have [had] the h--l beat out of him." Trooper Hoy testified that Appellant's demeanor changed and that he became "real sleepy" as they drove to the jail; Trooper Hoy later transported Appellant to a local hospital for a medical evaluation. Following an evaluation, Appellant was medically cleared and transported back to the Brown County jail.

B. *Testimony of Deputy John Geis*

Deputy John Geis with the Brown County Sheriff's Department investigated the scene after the altercation and spoke to some of the witnesses at the lake and the hospital. Daymond Benson—Barbara's father—told Deputy Geis that the altercation started over a shot of "Crown" and that Appellant threatened to stab the group before he stabbed Barbara, which caused Appellant's knife to break. Antonio, Daymond, and Brayden Blackburn—Barbara's son—said that Antonio and Blackburn fought with Appellant after the knife broke and that Appellant also attempted to stab Antonio with the broken knife. Daymond remained with Barbara while the others fought. Deputy Geis testified that Steven "den[ied] being in the fight" and that Steven said that "he came in later." According to Deputy Geis, no witnesses stated that Steven was involved in the fight when it began. He also said that Alyssa refused to give a statement. In Deputy Geis's opinion, evidence obtained by law enforcement was consistent with witnesses' statements regarding the circumstances of the altercation.

C. *Testimony of Barbara Zapata*

Barbara testified that Appellant had been at the lake four to five hours before she was stabbed. She testified that Alyssa brought various utensils to the lake that

4

day, including a serrated kitchen knife. Barbara recalled that Appellant and Alyssa were drinking "Crown Apple" whiskey, mixed with another beverage, from clear plastic cups.

That afternoon, Barbara found a plastic cup on a table with about "an inch of [the] drink" left, so she asked the group at the pavilion if the plastic cup was theirs. After hearing no response, she poured out the contents of the cup, filled it with water, and sat down in a chair between the pavilion and picnic tables. Thereafter, Appellant returned to the pavilion and asked the group where his cup was. Barbara held up the plastic cup and responded, "Is it this one?" Appellant asked Barbara if she poured out his drink and she responded affirmatively; they then began to argue. Daymond overheard the argument and told Appellant, "I'll buy you another bottle . . . it's not a big deal." Appellant said, "that's not the point . . . the point [is] that it's my f-----g cup." Antonio also overheard the argument and said, "[T]his is enough, y'all aren't gonna [sic] fight and argue over it." Barbara then "stormed" off and went to her vehicle.

Barbara testified that Antonio told Appellant to leave her alone. Appellant responded, "You're a b---h too." Multiple people, including Barbara, then asked Appellant to leave. Antonio walked toward Appellant, and the two men moved toward the end of the picnic table where Brayden and Daymond were located. Barbara recalled that, at this point in the altercation, everyone was "standing and yelling" except for Steven, who was at a nearby fishing dock. At some point, Appellant picked up the serrated knife from a picnic table and told Antonio, "I'll f-----g cut you." Barbara perceived Appellant's behavior as a threat, so she put herself between Antonio and Appellant and attempted to de-escalate the situation. Barbara testified that, even though Appellant had a knife, she was not scared because she "didn't think that [the argument] was gonna [sic] go any further."

5

Antonio told Appellant to "go ahead and stab [him]" and said that he was "not scared of a knife." Barbara testified that the next thing she remembered was that Appellant "swung his arm," which caused Antonio to "go around" her body and "tumble" with Appellant toward the lake. Brayden followed shortly behind. Barbara stated that she did not know that she had been stabbed but recalled that Daymond "put[] his arm around [her] shoulder and ask[ed] [her] to sit down" on the ground. Barbara observed that the knife blade did not pierce her clothing when she was stabbed; instead, the knife blade pushed her clothes into the wound before it broke, leaving a portion of the serrated blade embedded in her hip.

According to Barbara, Steven ran over from the dock to check on her after she was stabbed. He then chased after Appellant, caught him, and choked him. Barbara recalled that Antonio, Brayden, and Steven each hit Appellant after she was stabbed. Barbara also observed Appellant "swinging" the knife handle at them while they fought. After Alyssa returned from the restroom, she broke up the altercation. As Appellant fled, he yelled, "Did you think I wouldn't use it? Did you think I was f-----g playing?" Barbara was transported to the hospital by ambulance, and she underwent surgery to remove the blade that was embedded in her hip.[3]

On cross-examination, Barbara testified that "these [types of] encounters" were not common occurrences between herself and Appellant, but she acknowledged that Appellant and Antonio had "bickered back and forth off and on" in the past. Barbara stated that Antonio (1) had never directed racial slurs at Appellant, (2) was not associated with any gangs, and (3) had never killed anyone or boasted about it. Barbara further testified that Antonio did not "chest bump"

---

[3]Barbara testified that the knife wound was four and one-half inches deep and two inches in diameter, and that additional surgeries or other medical treatments may be required to address the effects of her injury.

Appellant during the altercation, and he was not very aggressive with Appellant before she was stabbed.

### D. *Testimony of Daymond Benson*

Daymond believed that Appellant was intoxicated when the altercation occurred and stated that Appellant's overreaction, yelling, and behavior led to other people at the pavilion becoming involved. He also stated that Steven was not at the pavilion when the altercation began. At some point, Daymond told Appellant, "You're making me want to slap the s--t out of you."

According to Daymond, as the argument escalated, Appellant grabbed the serrated knife and said, "I'll stick you." Barbara told Appellant to put the knife down and Appellant responded, "[b]---h, I'll stick you too." Barbara stepped toward Appellant and asked him to "give [her] the knife, don't be stupid." Appellant then "step[ped] sideways off the cement" under the pavilion, which was approximately six inches above the ground. Barbara grabbed Appellant by the wrist as he stepped off but lost her grip. Appellant then stabbed her on her side and the blade broke. Daymond testified that he helped Barbara after she was stabbed while Appellant "went towards the water" and fell. Daymond later heard Appellant laughing from inside the patrol unit after he was detained, stating, "Told you I'd do it."

### E. *Testimony of Deputy Toby Mathis*

Deputy Toby Mathis with the Brown County Sheriff's Department interviewed Barbara at the hospital approximately one hour after she was stabbed. During her statement, Barbara said that Steven was present during the altercation prior to the stabbing and tried to "de-escalate" the situation. He further stated that some of Barbara's statements during the interview were "somewhat confusing" as to whether Appellant picked up the knife once or twice, but that Barbara was on pain medication at the time.

7

Barbara told Deputy Mathis that the altercation began after Antonio and Steven tried to de-escalate an argument between Brayden and Appellant, and that Appellant was "swinging" at them while they were unarmed. Thereafter, Appellant picked up a knife from a table. Barbara said that she approached Appellant while he was walking "backwards" when she was stabbed.

F. *Testimony of Antonio Zapata*

Antonio was cooking food for the family when he overheard Appellant and Barbara arguing; he then asked Appellant to "just leave or pour another cup." Appellant picked up the knife and stated that he was going to stab Antonio. Antonio testified that he approached Appellant—without physically engaging him—and told Appellant, "Come with it then. I've been stabbed before. Let's do this." Barbara "got in the middle" and tried to de-escalate the situation. According to Antonio, Appellant tripped, kicked Barbara in the stomach, and stabbed Barbara. Once Barbara was stabbed, Antonio jumped over Barbara and "attacked" Appellant. Antonio recalled that Appellant attempted to use the knife handle to stab him in the ribs multiple times which resulted in "scrapes" on Antonio's body. Steven and Brayden then joined the fight.

Appellant said, "I told you I would do it" as he fled after the altercation. Antonio believed that Appellant's statement meant that he intended to hurt Antonio with the knife.

G. *Testimony of Brooklyn Borgia*

Brooklyn Borgia observed the stabbing after she returned from the restroom, which was located approximately twenty yards from the pavilion.[4] Borgia heard yelling as she walked back and saw Appellant, Barbara, Antonio, and Daymond arguing. Borgia did not believe that anyone had a weapon at the time. Thereafter,

---

[4]Erin Sliger and Alyssa were also returning from the restroom at the time.

some of the group "back[ed] away from the table." Borgia testified that Appellant was holding a knife at his side as they were backing up from the table, but she did not know when he obtained it. Additionally, she believed that Appellant was the only individual with a knife or weapon during the altercation. Borgia recalled that Barbara was the closest person to Appellant before the stabbing.

Borgia looked away when the stabbing occurred but remarked that "[e]verybody. . . went ballistic after [Barbara] got stabbed." After the stabbing, she observed Antonio "pin[]" Appellant on the ground. Brayden then hit Appellant. Borgia testified that Steven was not present at the pavilion when Barbara was stabbed, but that he "show[ed] up afterwards"; she thought Steven "also came and hit Jamal" after the stabbing. Borgia called 9-1-1 and Appellant fled.

H. *Testimony of Erin Sliger*

Sliger, Alyssa's cousin, was also returning from the restroom when the altercation occurred. She recalled hearing Antonio tell Appellant, "[y]ou're not gonna [sic] stab nobody, put the knife down." Sliger believed that Antonio did not physically touch Appellant before the stabbing occurred; rather, Antonio "[came] up to [Appellant]," which caused Appellant to back up. Sliger testified that Barbara was stabbed after Appellant and Barbara fell next to the pavilion. Appellant then fought with Antonio. Sliger recalled that Appellant was holding the broken knife when he fought Antonio, and she observed that approximately one inch of the broken blade was protruding from the knife handle in Appellant's possession.

I. *Testimony of Steven Benson*

Steven testified that he was at a fishing dock, approximately 150 yards away from the pavilion, when the altercation occurred. Steven did not see the stabbing but testified that he ran to the pavilion as soon as he heard people scream that his "sister got stabbed." Steven recalled that, once he got to the pavilion, Appellant

9

yelled, "I told you I would do it." Steven testified that he "put [Appellant] on the ground" before they "thr[ew] punches" at each other. Steven also engaged Appellant in a "headlock" and choked him.

Steven later saw Appellant sitting in the passenger's seat of Trooper Hoy's patrol unit. According to Steven, Appellant smiled, "flipped [Steven] off," and said, "I told you I would do it." Steven admitted that he was angry after the stabbing occurred and that he yelled back at Appellant, but he did not recall what was said.

J. *Testimony of Appellant*

Appellant recounted a different sequence of events. Appellant testified that everyone was upset and "in a mourning state" that day. He recalled that he brought "Crown" to the gathering and was pouring drinks for everyone, including himself. At some point, Appellant went on a boat ride with his son. When Appellant returned to the pavilion, he noticed that his cup of "soda" was empty. Appellant said that he asked the group "what happened to [his] drink," but his inquiry was ignored.

Appellant got closer to the group and asked the same question again. Barbara said that she "poured [his drink] out" and told Appellant to "leave her the f--k alone about it." Appellant then said, "[w]hatever. . . you cry about everything." Barbara walked away. According to Appellant, Antonio approached him, "chest bumped" him five or six times to "back [him] up," and told him to leave. They exchanged "cuss words" as Appellant backed up through a row of tables in the pavilion. Around this time, Appellant noticed that five individuals—Daymond, Steven, Brayden, Antonio, and Barbara—were "closing on" him and he became "scared."

Appellant told the group that he could "whoop" Antonio. Steven retorted, "No, we'd kill you." Appellant testified that Steven's response "frightened" him. After Appellant reached a step at the end of the pavilion, he grabbed a knife from a table and told the group to "back the f--k up." However, the group continued to

10

approach him. Antonio told Appellant that "he [had] been stabbed before" and "to go ahead [and] use the knife." According to Appellant, Barbara then got close to him, yelled something "in his face," and kicked him in the chest, which caused Appellant to fall onto the ground. Appellant testified that he kicked Barbara as he fell and that several individuals from the group punched him in the face, head, and ribs while he was on the ground. Appellant did not know who hit him because he covered his face. Appellant further stated that someone was "stomp[ing] and kick[ing]" him which caused a "sharp pain" on his left hip. At some point, Appellant got up.

Appellant confirmed that he believed he was in imminent danger of serious bodily injury at this time and that his only recourse was to "fight back," so he "swung" the knife toward the group—which struck Barbara and caused the knife blade to break. Antonio then jumped on Appellant before he could run away, and Brayden punched Appellant in the face. Appellant "balled up" while Antonio and Brayden punched and kicked him. Steven later put Appellant into a choke hold and said, "[you're] dead." Appellant stated that his breath was impeded by the chokehold and that he "thought he was dead," but Alyssa ran over to stop the altercation, which caused Steven to release him.

Appellant testified that he did not have a good relationship with Antonio or Steven and said that the family had made racial comments about him in the past. Appellant testified that the family would often "fight[]. . . any time there's alcohol involved." Appellant believed that Antonio, Brayden, Daymond, and Steven each had a history of violence and fighting, which made him fearful of them. Further, Appellant believed that each of them were known to carry a weapon, like a knife or a firearm, on their person.

On cross-examination, Appellant recalled that everyone was wearing swim attire while at the lake, and he knew Antonio did not have a firearm on his person that day. However, Appellant testified that Brayden "could very well possibly" have had one. Appellant admitted that no one at the gathering prevented him from leaving the park before he grabbed the knife. Additionally, Appellant admitted that he threatened to stab Antonio during the altercation and that he had possession of the broken knife while he fought with Steven and Brayden. He also admitted that the ensuing altercation would not have occurred had he left; however, Appellant did not leave because (1) he was "worried" that Barbara poured out his drink, (2) "by the time [he] registered that the [altercation] was escalating" he was "surrounded," and (3) he did not think it was fair for the family to ask him to leave.

Appellant further testified that, following the altercation, he could: (1) walk and run; (2) talk to the police; (3) use "Siri" to make a phone call to his grandmother; (4) recognize that he was being recorded while he was detained in the patrol unit; (5) use his foot to roll down the passenger window of the patrol unit; and (6) make gestures to the family while detained. Finally, Appellant said that he had his cell phone after the altercation but was unsure how it came into his possession. Appellant recalled that he ran through the pavilion area when he fled.

K. *Testimony of Alyssa Blackburn*

Alyssa's observation of the altercation differed from Borgia's and Sliger's testimony. After Alyssa returned from the restroom, she saw Barbara, Antonio, Steven, Daymond, and Brayden "surround" Appellant and "yell" at him. The group then repeatedly pushed Appellant onto the ground as he tried to get up. At some point while he was on the ground, Appellant "swung" and stabbed Barbara. Alyssa testified that although the group "pushed" Appellant in the face, the altercation did not "turn into blows" until Barbara was stabbed. After that, the group "surrounded"

12

Appellant and kicked him in the body and head. Alyssa testified that she was "worried for [Appellant's] safety" after the stabbing, so she jumped on top of Appellant to "protect his head." According to Alyssa, the group started "kicking" her as well. She testified that Appellant did not get along with her family, and that "[t]hey're always arguing."

L. *Testimony of Debra Gail Harwell*

Debra was at a fishing dock with her family on the day of the altercation. She testified to hearing an argument between a male and a female coming from the park pavilion, approximately "half a football field" away. As the argument escalated, she called 9-1-1 to report the disturbance. She believed that it was "a bunch of guys fighting" near the water, but she did not see anyone get stabbed. She testified that she did not remember whether anyone else was on the dock when the altercation occurred.

M. *Testimony of Dr. Johnathan Ford*

Dr. Johnathan Ford, an emergency medicine physician and the medical director for the emergency department at Hendrick Medical Center in Brownwood, testified about the treatment he provided to Barbara, Brayden, and Appellant after the altercation. Dr. Ford believed that the injuries to Brayden's hands were consistent with "blunt trauma or hitting something directly." Dr. Ford testified that Barbara's stab wound required surgery to remove the blade from her hip, and he was concerned that she could develop a debilitating condition in the future because of the injury. As for Appellant's injuries, Dr. Ford observed that Appellant had scrapes, contusions, and swelling on his face, and he testified that, while it is possible that Appellant sustained a mild concussion, it would not appear on a CAT scan.

Although a self-defense instruction was submitted in the trial court's charge,[5] the jury found Appellant guilty of both indicted offenses.

## II. *Standard of Review*

In his sole issue, Appellant argues that the evidence is insufficient to support the jury's rejection of his claim of self-defense for both offenses.[6]

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Similarly, when a defendant challenges the sufficiency of the evidence to support the rejection of a defensive theory asserted by him, such as self-defense, we examine all the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the defendant guilty of all essential elements of the charged offense beyond a reasonable doubt and also could have found against the defendant on the self-defense issue beyond a reasonable doubt.

---

[5]In most scenarios, a defendant who uses deadly force against an unarmed victim is not entitled to a deadly-force self-defense instruction. *See Luna v. State*, 687 S.W.3d 79, 109 n.7 (Tex. App.—Eastland 2024, pet. ref'd) (compiling cases involving unarmed victims where a defendant was not entitled to a deadly-force self-defense instruction).

[6]However, Appellant does not argue that the evidence is insufficient to support the elements of aggravated assault as charged in either Count One or Two of the indictment.

*Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see also Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018) (reaffirming *Saxton*).

To support a claim of self-defense, the defendant bears the burden to produce some evidence to support the defense; the State bears the burden of persuasion to disprove it. *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)); *Saxton*, 804 S.W.2d at 913–14. Once the defendant produces that evidence, the State's burden does not require the production of additional evidence to disprove the defense; instead, it requires only that the State prove the defendant's guilt beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594–95. Furthermore, because the State must rebut a defensive issue by establishing the defendant's guilt beyond a reasonable doubt, we review sufficiency challenges to the jury's rejection of a defensive issue under the traditional legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Saxton*, 804 S.W.2d at 914.

When a defendant raises a justification defense, such as self-defense, a finding of guilt by the jury is an implicit rejection of the defensive theory. *Zuliani*, 97 S.W.3d at 594–95; *Saxton*, 804 S.W.2d at 914; *see also Miller v. State*, 712 S.W.3d 235, 250 (Tex. App.—Eastland 2025, pet. filed). Therefore, because a claim of self-defense is a fact issue to be determined by the jury, the jury is free to accept or reject the defensive theory, either version of the facts, and any part of a witness's testimony. *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *see Saxton*, 804 S.W.2d at 912 n.3.

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007);

*Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 761; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13); *Lee*, 676 S.W.3d at 915. A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.*

16

Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

### III. *Analysis*

As relevant here, a person commits the offense of aggravated assault if he intentionally or knowingly threatens another with imminent bodily injury or causes serious bodily injury to another and uses or exhibits a deadly weapon during the commission of the assault. *See* PENAL §§ 22.01(a)(2), 22.02(a)(2). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." PENAL § 1.07(a)(8) (West Supp. 2025). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). "Deadly weapon" is defined as "anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(A), (B). This offense becomes a first-degree aggravated assault if, as here, "the [defendant] uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, [of the] Family Code," such as a family member or a member of the defendant's household. *Garcia*, 667 S.W.3d at 762 (quoting PENAL § 22.02(b)(1)); *see* TEX. FAM. CODE ANN. §§ 71.003, .005 (West 2019).

It is undisputed that Appellant (1) stabbed Barbara with a knife, and (2) attempted to stab Antonio with a broken knife. Appellant concedes that there is sufficient evidence for the jury to have found the essential elements of the charged

17

offenses beyond a reasonable doubt. Rather, in this appeal, Appellant only challenges the sufficiency of the evidence to support the jury's rejection of his claim of self-defense for each offense.

In asserting self-defense, the use of force is justified "when and to the degree the [defendant] reasonably believes the force is immediately necessary to protect the [defendant] against the other's use or attempted use of unlawful force." PENAL § 9.31(a). Similarly, a person is justified in using deadly force against another (1) if he would be justified in using force against the other under Section 9.31 and (2) when and to the degree he reasonably believes that deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. PENAL § 9.32(a)(1), (a)(2)(A) (West 2019). "'*Deadly force*' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3) (emphasis added).

"The *reasonably believes* language contains subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021) (emphasis added). First, a "defendant must subjectively believe that another person used or attempted to use unlawful force (Section 9.31) or deadly force (Section 9.32) against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* Second, a defendant's subjective belief must be objectively reasonable, because a *reasonable belief* is one that would be held by an ordinary and prudent person in the same circumstances as the defendant. *Id.* (citing PENAL § 1.07(a)(42)).

A defendant's belief that deadly force was immediately necessary is presumed to be reasonable if: (1) the defendant knows or has reason to believe that the person against whom the deadly force was used was committing or attempting to commit

18

an enumerated offense as described by Section 9.32; (2) the defendant did not provoke the person against whom the force was used; and (3) the defendant was "not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used." *See id.* § 9.32(b). Moreover, evidence of self-defense may be raised by "other witnesses' testimony about the defendant's acts and words at the time of the offense." *Lozano*, 636 S.W.3d at 33 (citing *Smith v. State*, 676 S.W.2d 584, 585 (Tex. Crim. App. 1984)).

The trial court submitted a multiple-assailants instruction. *See Jordan v. State*, 593 S.W.3d 340, 343–44 (Tex. Crim. App. 2020) ("When the evidence viewed from the defendant's standpoint shows an attack or threatened attack by more than one assailant, the defendant is entitled to a multiple assailants instruction."). For each count, the jury was instructed to acquit Appellant if they believed that Appellant's use of deadly force in each instance was immediately necessary to protect himself against the use or attempted use of unlawful deadly force by Barbara, Antonio, Daymond, Steven, or Brayden. *See id.* at 344 ("'[M]ultiple assailants' does not require evidence that each person defended against was an aggressor in his own right; it requires evidence that the defendant had a reasonable fear of serious bodily injury from a group of people acting together.").

Appellant contends that a rational jury could not find against him on the issue of self-defense because the evidence adduced at trial established that: (1) he was not the initial aggressor of the altercation; (2) his actions were in response to the actions of multiple individuals—Barbara, Antonio, Steven, Brayden, and Daymond—who were "yelling, cursing and physically pushing" him; (3) he had a right to be present at the park on the day of the altercation; (4) he subjectively believed that deadly force was immediately necessary to protect himself from the others use or attempted

use of unlawful force against him; and (5) his use of force was proportional to the threats that were directed at him during the altercation.

We note that the evidence upon which Appellant relies to support his claim that he was acting in self-defense is derived in part from statements that he made to law enforcement—recordings of which were published to the jury—and his trial testimony. Thus, Appellant's theory of self-defense was inherently a credibility issue for the jury to resolve, and because it was, the jury was free to reject it. *See Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 611–13; *Barron v. State*, 630 S.W.3d 392, 404 (Tex. App.—Eastland 2021, pet. ref'd).

Here, there is sufficient evidence to support the jury's rejection of Appellant's claim of self-defense. First, a reasonable jury could have concluded that Appellant provoked the altercation, thereby rebutting the presumption that Appellant's belief that his use of force was reasonable under the circumstances. *See* PENAL § 9.32(b); *see also Harrell v. State*, No. 11-22-00261-CR, 2024 WL 39936, at *3–4 (Tex. App.—Eastland Jan. 4, 2024, no pet.) (mem. op., not designated for publication). Second, the evidence also supports the jury's rejection of Appellant's claim that he subjectively believed that his use of force was immediately necessary to protect him against the group's use or attempted use of unlawful force. *See* PENAL §§ 9.31(a), 9.32(a), (b); *see also Lozano*, 636 S.W.3d at 32–33; *Jordan*, 593 S.W.3d at 343–44.

Appellant first argues that the following evidence demonstrates that Barbara provoked the altercation, and that the jury acted irrationally when it did not find in favor of Appellant on his claim of self-defense: (1) multiple individuals (the group) physically pushed Appellant from the pavilion while yelling at him; (2) Appellant's testimony regarding threats made against him in the past by family members; (3) Barbara's statements at the hospital and Debra's statements, which indicated that Steven was present at the pavilion before the stabbing occurred and not on the dock;

(4) Steven and Daymond have a criminal history; and (5) Appellant's testimony regarding his subjective belief that deadly force was immediately necessary under the circumstances.

While some of Appellant's statements regarding the circumstances of the initial altercation were consistent with the testimony and evidence adduced at trial and may have, if believed, indicated that he did not provoke the altercation, the jury was not required to accept Appellant's version of events as true simply because some evidence or witness testimony supported it. *See Braughton*, 569 S.W.3d at 609; *Saxton*, 804 S.W.2d at 914. Additionally, Appellant admitted that (1) no one at the gathering prevented him from leaving the park before he grabbed the knife, (2) he threatened to stab Antonio during the altercation, and (3) the ensuing altercation would not have occurred had he left. When the record supports conflicting inferences, as it does here, we presume that the factfinder resolved the conflicts in favor of the verdict. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762. In this case, the jury was free to assess the credibility of the witnesses and rationally determine, based on the evidence presented, that Appellant provoked the altercation with the others. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Barron*, 630 S.W.3d at 404. Therefore, we conclude that there is sufficient evidence, consistent with the jury's verdict, that the presumption of reasonableness in Section 9.32(b) does not apply. *See* PENAL § 9.32(b); *see also Harrell*, 2024 WL 39936, at *5.

Appellant also asserts that his use of force—stabbing Barbara with the knife or his attempts to stab Antonio with the broken knife—was proportional to the threats that he faced during the altercation. However, the facts before us do not support his contention that the jury acted irrationally when it rejected his claim of self-defense against the unarmed victims—Barbara and Antonio. *See Lane v. State*,

151 S.W.3d 188, 192 (Tex. Crim. App. 2004); *Quincy v. State*, 304 S.W.3d 489, 499–500 (Tex. App.—Amarillo 2009, no pet.); *see also Taylor v. State*, No. 11-24-00234-CR, 2026 WL 545754, at *8–9 (Tex. App.—Eastland Feb. 27, 2026, no pet.) (mem. op., not designated for publication).

Barbara and Antonio were both unarmed during the altercation, and there was no evidence presented at trial that Brayden had a firearm on his person, as Appellant believed, or that he could have. While there was some evidence to indicate that either Antonio or Steven may have made verbal threats of violence toward Appellant before Barbara was stabbed, there was no indication that any of the family members possessed a weapon of any kind or intended to use unlawful deadly force during the altercation. *See Hall v. State*, 640 S.W.3d 333, 346 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd). Instead, multiple witnesses testified that Appellant was the only individual with a weapon—a knife—and that the group did not physically touch Appellant as he backed away from the pavilion. Witnesses also testified that after Appellant grabbed the knife, he made threats to stab someone, stabbed Barbara, and then attempted to use the broken knife to stab Antonio.

To the extent Appellant asserts that his injuries indicate that "[h]e fought back however he could," Trooper Hoy testified that he did not believe that Appellant needed immediate medical attention when Appellant flagged him down a quarter of a mile from the pavilion area. Dr. Ford testified that Appellant had some "scrapes, contusions, and swelling on his face," but he was unable to determine if Appellant suffered a concussion. Appellant testified that he was not impaired by the injuries he claimed to have sustained because after the altercation he was able to flee, make contact with law enforcement, and engage in multiple conversations while he was detained in Trooper Hoy's patrol unit. Furthermore, even though there was some evidence indicating that Steven was present at the pavilion, other witnesses testified

22

that he was not present when the altercation began; therefore, the jury was free to consider this conflicting evidence and assess its credibility when it rejected Appellant's claim of self-defense. In sum, from this evidence, a rational jury could have reasonably disbelieved Appellant's version of events and found that Appellant's use of deadly force under the circumstances was not justified. *See Taylor*, 2026 WL 545754, at *8–9.

On this record, the jury could have rationally concluded that Appellant's subjective belief that Barbara and/or Antonio used or attempted to use deadly force was not reasonable under the circumstances, and that Appellant did not have a reasonable fear of sustaining serious bodily injury from the group acting together at the time he used deadly force against Barbara and Antonio.[7] *See Bundy*, 280 S.W.3d at 434–35 (holding that a defendant's use of deadly force was not a justifiable response to an attempt to punch appellant, which was not deadly force); *Schiffert v. State*, 257 S.W.3d 6, 14 (Tex. App.—Fort Worth 2008, pet. ref'd) (holding that a punch to the defendant's face did not sufficiently demonstrate an "attempt to use deadly force" to justify the use of deadly force, and a reasonable jury could not have found that a defendant's use of force was justified where the defendant provoked the altercation and the victim did not use or attempt to use deadly force); *see also Taylor*, 2026 WL 545754, at *8–9. As such, we conclude that the evidence supports the jury's rejection of Appellant's claim that he subjectively believed that his use of deadly force against Barbara and Antonio was immediately necessary to protect him against their use or attempted use of unlawful force. *See* PENAL §§ 9.31(a),

---

[7]We note that even though there is some evidence that Appellant and other family members were consuming alcohol that day, there is no evidence that (1) these individuals were intoxicated at the time of the altercation, or (2) Appellant was aware of their intoxication. Thus, merely because Appellant testified that the family would fight "any time there's alcohol involved" is insufficient evidence of Appellant's alleged subjective reasonable belief that his use of deadly force was immediately necessary under the circumstances. *See Bundy v. State*, 280 S.W.3d 425, 435 (Tex. App.—Fort Worth 2009, pet. ref'd).

9.32(a)(2)(A); *see also Lozano*, 636 S.W.3d at 33–34; *Jordan*, 593 S.W.3d at 343–44; *Harrell*, 2024 WL 39936, at *3–4.

As we have said, Appellant's claim of self-defense was inherently a credibility determination for the jury to resolve. *See Febus*, 542 S.W.3d at 572; *Barron*, 630 S.W.3d at 404. The jury was free to disregard Appellant's claim, and its determination of Appellant's guilt is tantamount to a rejection of his claim and version of events. *See Braughton*, 569 S.W.3d at 611–13; *Saxton*, 804 S.W.2d at 914; *Barron*, 630 S.W.3d at 404. We have reviewed all the evidence in the light most favorable to the jury's verdicts and hold that the record contains sufficient evidence from which a rational trier of fact could have found the essential elements of the charged offenses beyond a reasonable doubt and could have also found against Appellant on the self-defense issue beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

Accordingly, we overrule Appellant's sole issue on appeal.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.


W. STACY TROTTER

JUSTICE

July 2, 2026

Do not publish. *See* TEX. R. APP. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.